IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEBBIE JONES,

    Plaintiff,

v.

NANCY A. BERRYHILL,
Commissioner of Social Security,

    Defendant.

No. C 16-05194 WHA

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this social security appeal, substantial evidence supports the ALJ's decision. Accordingly, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**.

## STATEMENT

**1. PROCEDURAL HISTORY.**

In January 2013, plaintiff Debbie Jones applied for supplemental security income, alleging she had been unable to work since June 15, 2012 due to degenerative disc disease, obesity, depressive disorder, and anxiety disorder (AR 15). The Commissioner denied Jones' application both initially and upon reconsideration (AR 144–47, 151–56). Jones requested an administrative hearing (AR 157–59).

On March 9, 2015, Jones had a hearing before Administrative Law Judge Nancy M. Lisewski (AR 50–66). The ALJ rendered a decision on March 31, 2015, finding that Jones was

not disabled (AR 9–28). Jones requested administrative review of the ALJ's decision, which the Appeals Council denied (AR 7–8, 1–6). Jones filed this action on September 9, 2016, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. 405(g). The parties now cross-move for summary judgment.

### 2. TESTIMONY AT THE ADMINISTRATIVE HEARING.

At the hearing before the ALJ, Jones testified that she could not work because she suffered from depression, anxiety, and physical pain in her legs and back. She stated that she could only stand, walk, or sit for 10 or 20 minutes due to pain. After she felt pain from sitting, she repositioned herself by standing or laying down. She testified that she could lift ten pounds (AR 16).

Jones also testified that she took medication and underwent therapy for her depression but still experienced severe depression two to four times a week. She did not have a driver's license, so when her daughter could not drive her, Jones took public transportation (AR 52–62).

Furthermore, Ms. Rind, a vocational expert whose full name was not stated in the hearing transcript, testified that an individual of Jones' age, education, and work background who was limited to medium work would be able to find work in California.

Ms. Rind also stated, however, that an individual who was unable to perform at a consistent pace "without an unreasonable number of breaks 30 percent of the time," "unable to handle a normal amount of stress 30 percent of the time," and "unable to interact appropriately with the public, coworkers and supervisors approximately 30 percent of the time" would not find work (AR 62-66). Ms. Rind also stated that an individual who was off task fifteen percent of the time would not be competitive to find work, as fifteen percent "is the cusp where people begin to [fail] to maintain competitive employment" (AR 64).

### 3. MEDICAL EVIDENCE.

The medical evidence was summarized in the ALJ's decision (AR 15–22). This order will also briefly review both Jones' self-reported symptoms and the findings of each physician who examined her.

In July 2012, Kathleen Hicks, M.D., Jones' treating physician at Alameda County Medical Center, evaluated Jones and concluded that she had impingement of nerves in her back, causing pain, numbness, and decreasing function. Dr. Hicks concluded that Jones could stand or walk for two hours in an eight-hour day, sit for four hours in an eight-hour day, could not use her feet for repetitive movements, and could not lift more than ten pounds.

In September 2012, neurologist Ananth Acharya, M.D., reported that Jones had abruptly ceased taking her psychotropic medication because of concerns about possible side-effects. Without the psychotropic medication, which managed Jones' psychiatric problems, she experienced increased anxiety and began hearing voices. Dr. Acharya suggested a link between Jones' physical symptoms and her psychotropic medication (AR 16–17).

In March 2013, Jones had a physical examination at Alameda County Medical Center and was diagnosed with lumbosacral radiculopathy. At a follow-up examination in June 2013, neurologist Farah Rana, M.D., diagnosed Jones with probable mild degenerative disc and joint disease and possible mild arthritis involving her hands, knees, and feet. Dr. Rana concluded that Jones could stand or walk for six hours in an eight-hour day with breaks, sit for six hours in an eight-hour day with breaks, carry 25 pounds frequently and 50 pounds occasionally, and push and pull devices up to 50 pounds. Dr. Rana concluded that Jones was otherwise unlimited in her capacity to work (AR 17).

In September 2013, Jorge Kim, M.D., performed an orthopedic evaluation of Jones at Alameda County Medical Center in response to her complaints of lower back pain spreading into her legs. Dr. Kim recorded that the physical examination was unremarkable other than Jones' decreased range of motion in her spine and recommended conservative care, which included a physical therapy program. In October 2013, Dr. Kim noted that previous EMG and MRI did not confirm that Jones had lumbosacral radiculopathy (AR 17–18).

In January 2014, Jones had an MRI of her cervical spine, which showed no significant degenerative disc disease or other positive objective findings. Jones visited Dr. Hicks again at Alameda County medical Center in May 2014. Dr. Hicks observed that Jones was "'relatively high functioning,' as she was exercising, in a relationship with her boyfriend and able to take

care of herself." Jones complained of hand numbness, for which Dr. Hicks recommended that Jones undergo an EMG. The EMG was performed in August 2014 without any showing of physical disability (AR 18).

In June 2014, Jones visited Olga Goldberg, M.D., at Alameda County Medical Center. Dr. Goldberg's physical examination of Jones was negative except for possible decreased left hip flexion strength and a "very mild bilateral action tremor." In the same month, Jones visited Swapnil Shah, M.D., at Alameda County Medical Center, complaining of bilateral knee pain. Dr. Shah noted that an x-ray showed "very minimal arthritis in the knees." The date of the x-ray is unclear from the record.

In September 2014, Jones visited Peter Slabaugh, M.D., an orthopedist at Alameda County Medical Center on complaints of back and leg pain. Dr. Slabaugh's "physical examination was generally unremarkable with evidence of reasonably good motion in [Jones'] back, negative straight leg raising bilaterally and no motor, sensory or reflex abnormalities" (AR 18).

In addition to physical symptoms, Jones also has a history of psychiatric symptoms. She began treatment at Pathways to Wellness in July 2010 on complaints of increased stress and was diagnosed with depressive disorder. She was prescribed Valium and additional psychotropic medication. In June 2011, Jones began seeing Rue Whitaker, a marriage and family therapist. In June 2012, Ms. Whitaker evaluated Jones and concluded that she was "markedly limited in her abilities to understand and remember simple instructions, work close to others without being distracted, perform at a consistent pace, and handle normal work stress" (AR 18–19).

On subsequent visits to Pathways to Wellness through mid-2013, Jones was consistently described as clinically stable and her psychiatric symptoms improved. In June 2013, Dr. Jonathan Howard, Psy.D., performed a consultative psychological examination at Pacific Health Clinic on Jones based on her complaints of auditory hallucinations, depression, and anxiety. Dr. Howard reported that Jones' memory and attention were impaired. He diagnosed her with a mood disorder and concluded that she was "moderately-markedly

impaired in her ability to interact effectively with supervisors, coworkers and the public . . . and that she had moderate impairments in her abilities to understand and carry out simple instructions and tasks, attend to and concentrate on usual work situations, and maintain pace and persistence" (AR 19).

In October 2014, Ms. Whitaker assessed Jones' work capacity and found that Jones' ability to meet the mental demands of work had improved since June 2012. Ms. Whitaker found that Jones was markedly limited in her ability to work close to others, interact appropriately with the public, handle normal work stress, and accept instructions and criticisms from supervisors (AR 20).

In January 2015, Dr. Hicks evaluated Jones to determine if she could meet the mental demands of work. She concluded that Jones was suffering from post-traumatic stress disorder and was markedly limited in her ability to maintain attention and concentration for extended periods, work in close proximity with others without being distracted, perform at a consistent pace without an unreasonable number of rest periods, handle normal work stress, and interact appropriately with coworkers and the public (AR 20).

**ANALYSIS**

1. **LEGAL STANDARD.**

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities;" thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Ibid.*

The claimant has the burden of proving disability. *Id.* at 1040. Disability claims are evaluated using a five-step inquiry. 20 C.F.R. 404.1520. In the first four steps, the ALJ must determine: (i) whether the claimant is working, (ii) the medical severity and duration of the claimant's impairment, (iii) whether the disability meets any of those listed in Appendix 1, Subpart P, Regulations No. 4, and (iv) whether the claimant is capable of performing his or her previous job; step five involves a determination of whether the claimant is capable of making an adjustment to other work. 20 C.F.R. 404.1520(a)(4)(i)–(v). In step five, "the burden shifts to the Secretary to show that the claimant can engage in other types of substantial gainful work that exists in the national economy." *Andrews*, 53 F.3d at 1040. If the ALJ chooses to use a vocational expert, hypothetical questions asked "must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (internal citation omitted).

**2.  THE ALJ'S FIVE-STEP ANALYSIS.**

In her decision, the ALJ found at step one of the sequential evaluation process that Jones had not engaged in substantial gainful activity at any time (AR 14–15).

At step two, the ALJ reviewed Jones' medical records and found that her impairments had more than a minimal effect on her ability to work, such that they were severe (AR 15).

At step three, the ALJ found that Jones did not have an impairment or combination of impairments that met the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (AR 15–16).

At step four, the ALJ found that Jones was not capable of performing her previous job, but still had the capacity to perform medium work as defined in 20 CFR 516.967(c). According to Jones' medical records, she sustained a back injury while working in 2004. An MRI of her spine showed no evidence of nerve compression or structural abnormality.

At step five, after reviewing Jones' age, education, work experience, and residual functional capacity, the ALJ found that Jones was able to perform other jobs that existed in significant numbers in the national economy.

### 3. THE ALJ DID NOT ERR IN HER EVALUATION OF THE STATE AGENCY PHYSICIAN OPINION.

Jones argues that Social Security Ruling 96–6p requires the ALJ to consider the opinions of state agency physicians and explain the weight given to such physician opinions. The ALJ stated in her decision that she gave great weight to the opinion of state agency physician J. Bradus, M.D. Jones alleges that Dr. Bradus found her capacity limited to light work and that there was therefore an inconsistency between the ALJ giving great weight to the state agency physician's opinion and the ALJ deciding that Jones could perform medium work (Dkt. No. 20 at 5–6).

Jones misreads Dr. Bradus' evaluation. Nowhere in the evaluation did it state that Jones was limited to light work. Dr. Bradus stated that Jones could carry 50 pounds occasionally and 25 pounds frequently, stand or walk for six hours, and sit for six hours in an eight-hour day. Furthermore, Dr. Bradus found that Jones was no more than moderately limited in her capacity to concentrate, socially interact, and understand and remember instructions. These findings support the ALJ's decision that Jones could perform medium work.

### 4. THE ALJ DID NOT ERR IN REJECTING OPINIONS REGARDING JONES' MENTAL FUNCTION.

Jones alleges that the ALJ erred in rejecting opinions stating that Jones was limited in her ability to interact and accept criticism from supervisors. Jones cites evaluations by Cheryl Woodson-Johnson, Psy.D., Said Shefayee, M.D., and Dr. Bradus for stating a moderate to marked limitation in Jones' ability to interact appropriately with supervisors (Dkt. No. 20 at 6). This argument fails for the same reasons stated above, as Jones misreads the evaluations. Dr. Woodson-Johnson's evaluation provided the same substantive result as that of Dr. Bradus, stating that Jones was no more than moderately limited in her capacity to concentrate, socially interact, and understand and remember instructions. The ALJ did not reject Dr. Woodson-Johnson's evaluation, as the evaluation supports the ALJ's decision that Jones is capable of performing medium work.

Jones also argues that the ALJ erred in rejecting the assessment by Dr. Shefayee. The ALJ did not explicitly reject Dr. Shefayee's evaluation, but rather did not address it in her

7

written decision. Even if the ALJ discussed Dr. Shefayee's evaluation, it would not support Jones' argument because the only portion of the evaluation discussing her interaction with supervisors states that "she is able to accept instructions from the supervisor" (AR 328).

### 5. THE ALJ DID NOT ERR IN REJECTING THE OPINIONS OF DR. HOWARD AND MS. WHITAKER.

Jones alleges that her evaluations "assessed moderate to marked limitations in the ability to interact appropriately with supervisors" (Dkt. No. 20 at 6). Jones does not cite evaluations that state this proposition. The evaluations by Dr. Howard and Ms. Whitaker, which Jones did not cite, stated that Jones was markedly limited in her ability to interact with supervisors. The ALJ permissibly rejected Dr. Howard's assessment, as it was inconsistent with Jones' medical record, namely the treatment records from Pathways to Wellness. The assessment was also consultative rather than from a treating physician, supporting the ALJ's decision to give the assessment less weight (AR 21).

The ALJ did not err in rejecting the evaluation by Ms. Whitaker, a marriage and family therapist, because she is not an acceptable medical source. *See* 20 C.F.R. § 416.902 (defining "acceptable medical source").

### 6. THE ALJ DID NOT ERR IN FINDING JONES CAPABLE OF EMPLOYMENT.

Jones alleges that the ALJ erred in deciding that Jones could find employment despite Dr. Woodson-Johnson's finding a moderate limitation in Jones' ability to complete a normal workday and workweek without interruptions. Jones argues that the ALJ erred because the vocational expert testified that an individual who is limited fifteen percent of the time will be unable to find work (Dkt. No. 20 at 9–10). This argument assumes that a moderate limitation decreases an individual's capacity by at least fifteen percent.

Jones' activities undermine her argument, as Jones and her mother stated that Jones could perform personal care, cook, clean, do laundry, and go shopping. Furthermore, Dr. Hicks noted that Jones was "relatively high functioning," as she exercised and maintained a relationship with her boyfriend. These assessments support the fact that Jones is capable of performing medium work.

8

### 7. THE ALJ PROVIDED CLEAR AND CONVINCING REASONS TO REJECT JONES' SUBJECTIVE SYMPTOM TESTIMONY.

The ALJ is not "required to believe every allegation of disabling pain." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989). But where, as here, Jones presented evidence of ailments that "could reasonably be expected to produce the pain or other symptoms alleged," the ALJ must give "specific, clear and convincing reasons" in order to reject her testimony about the severity of the symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir.2009).

Jones argues that the ALJ did not provide clear and convincing reasons to reject Jones' subjective symptom testimony because the ALJ relied on (1) Jones' daily activities and (2) the fact that her symptoms were unsupported by clinical evidence.

*First*, the ALJ did not err in relying on Jones' daily activities to determine that she could perform medium work. "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain and other symptoms because impairments that would unquestionably preclude work will often be consistent with doing more than merely resting in bed all day." Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014). In *Garrison*, the claimant was heavily assisted by her mother to complete daily activities and was unable to perform activities such as doing laundry. *Ibid.* In contrast, Jones can perform personal care, cook, clean, do laundry, and go shopping. She is therefore capable of completing more activities than the claimant in *Garrison*, all without the aid of her mother. The ALJ reasonably concluded that Jones' daily level of activity undermined her subjective symptom testimony.

*Second*, the ALJ did not err in considering the lack of medical evidence as a factor in rejecting Jones' subjective symptoms. A lack of medical evidence cannot act as the sole basis for rejecting pain testimony but "it is a factor that the ALJ can consider in [her] credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). The lack of medical evidence was not the sole basis for rejecting Jones' physical symptoms because the ALJ also relied on the testimonies of Jones and her mother regarding Jones' daily activities, which supported the finding that Jones could work.

The repeated evaluations of Jones, in search of evidence for her physical symptoms, was convincing that Jones' pain testimony was overstated. Dr. Rana directly examined Jones in

March 2013, concluding that Jones could perform medium work. In September 2013, Dr. Kim also performed a physical evaluation on Jones and reviewed her MRI and EMG results, noting that the results were unremarkable. A subsequent MRI in January 2014 did not find significant signs of degenerative disc disease. That same year, Dr. Goldberg's physical examination of Jones showed no signs of physical ailments that would cause Jones' pain. Also in the same year, Dr. Shah found that Jones' x-rays showed minimal arthritis in her knees. Finally, Dr. Slabaugh's September 2014 physical examination of Jones was unremarkable. The ALJ therefore did not err because the ALJ provided several specific and convincing reasons to reject Jones' subjective physical symptoms (AR 16–22).

Furthermore, the ALJ did not err in rejecting Jones' subjective symptoms for mental disabilities because Jones had a history of non-compliance with medical treatment. "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. § 416.930(a). Dr. Acharya noted in September 2012 that Jones had abruptly ceased taking her psychotropic medication one week earlier because she was worried about side effects. In January 2014, Jones' psychiatrist at Pathways to Wellness noted that Jones was not fully compliant with instructions to take her medication. In May 2014, Jones' psychiatrist noted that Jones had been taking her psychotropic medication on and off. These inconsistencies undermine the credibility of Jones' psychological claims, as they may be a result of her non-compliance with treatment (AR 22).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: August 23, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE